IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREGORY L. TURNER,                              )
    679 Swan Drive                          )
    Deale, Maryland 20751                   )
                              )
           Plaintiff               )
                              )
    v.                                      )
                              )
UNITED STATES CAPITOL POLICE,                   )
    119 D Street, N.E.                      )
    Washington, DC 20510                    )
                              )
UNITED STATES CAPITOL POLICE BOARD,             )
    119 D Street, N.E.                      )
    Washington, DC 20510                    )
                              )
Hon. STEPHEN T. AYERS,                          )
    In his official capacity as the         )
    Architect of the Capitol                )
    1 First St., N.W.                       )
    Washington D.C. 20510                   )
                              )
Hon. WILSON S. LIVINGOOD,                       )
    In his official capacity as the         )
    Sergeant at Arms (retired),             )
    United States House                     )
    of Representatives                      )
    The Capitol, Room H-124                 )
    Washington, D.C. 20515                  )
                              )
Hon. TERRANCE W. GAINER,                        )
    In his official capacity as the         )
    Sergeant at Arms                        )
    U.S. Senate                             )
    1 First Street, N.W.                    )
    Washington, DC 20515                    )
                              )
Hon. PHILLIP D. MORSE,                          )
    In his official capacity as the         )
    Chief, U.S. Capitol Police              )
    *Ex officio*                            )
    119 D Street, N.E.                      )
    Washington, DC 20510                    )

Serve: Hon. PAUL D. IRVING,                    )
        In his official capacity as the        )
        Sergeant at Arms,                      )
        United States House                    )
        of Representatives                     )
        The Capitol, Room H-124                )
        Washington, D.C. 20515                 )
                                               )
        Hon. ERIC HOLDER                       )
        In his official capacity as the        )
        Attorney General of the                )
        United States,                         )
        U.S. Department of Justice             )
        950 Pennsylvania Ave., NW              )
        Washington, DC 20530                   )
                                               )
        And                                    )
                                               )
        Hon. RONALD C. MACHEN, JR.             )
        In his official capacity as the        )
        United States Attorney                 )
        For the District of Columbia           )
        555 4th Street, NW                     )
        Washington, DC 20530                   )
                                               )
        Defendants.                            )

## COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, Gregory L. Turner, by and through the undersigned counsel, and complains of the Defendants as follows:

## THE PARTIES

1.    Plaintiff Gregory L. Turner is a natural person and citizen of the United States of America and of the state of Maryland.  He is a former Lieutenant with the Defendant United States Capitol Police.

2.    Defendant United States Capitol Police ("USCP" or "the Agency") is a federal law enforcement agency that provides security for the United States Capitol Building and the Congressional community.

3.    Defendant United States Capitol Police Board ("USCPB") is a panel of consisting of three voting members who maintain jurisdiction over the USCP and exercise ultimate decision-making authority over proposed termination actions against USCP officers.

4.    Defendant Hon. Stephen T. Ayers is the Architect of the Capitol and was a voting member of the USCPB at the time of Plaintiff's termination.  He is sued in his official capacity.

5.    Defendant Terrance W. Gainer is the Sergeant at Arms of the United States Senate and was a voting member of the USCPB at the time of Plaintiff's termination.  He is sued in his official capacity.

6.    Defendant Wilson S. Livingwood, prior to his recent retirement, was the Sergeant at Arms of the United States House of Representatives and was a voting member of the USCPB at the time of Plaintiff's termination.  He is sued in his official capacity.

7.    Defendant Phillip D. Morse is the Chief of the USCP and was an *ex officio* member of the USCPB at the time of Plaintiff's termination.  He is sued in his official capacity.

## JURISDICTION AND VENUE

8.    This Court enjoys subject matter jurisdiction over this action pursuant to 2 U.S.C. §

1408(a) and, with respect to those claims that arise under the Constitution, pursuant to 28 U.S.C. § 1331. The Court enjoys personal jurisdiction over the USCP, the USCPB, and Defendants Livingood, Ayers, and Morse because they transact business in the District of Columbia, contract to supply services in the District of Columbia, caused the complained-of harm in the District of Columbia, and hold an interest in, use, and possess real property in the District of Columbia.

9.      Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (2) because the USCP, the USCPB, and Defendants Livingood, Ayers, and Morse reside in the District of Columbia, where a substantial part of the events giving rise to this complaint occurred.

STATEMENT OF FACTS

10.      Plaintiff joined the Agency on July 11, 1995, as a law enforcement officer. The Agency promoted him to sergeant in 1998 and to lieutenant in 2008. While a lieutenant, Plaintiff served as Patrol Division Section 3 Commander.

11.      That same year, 1998, Plaintiff joined the Tribes Motorcycle Club ("TMC"), an organization founded by five deputy sheriffs from Prince George's County, Maryland as an outlet for respectable, law-abiding, gainfully-employed individuals of good standing in the local community to pursue their recreational interest in motorcycling. TMC has earned a reputation for being a responsible, civic-minded organization that affects positive change in the local community. The Maryland House of Delegates and the Maryland Senate have bestowed public service awards upon TMC.

12.      TMC is not and never has been a criminal motorcycle gang. The American Motorcycle Association has recognized TMC as a social riding club. In fact, TMC members

staged and directed a training film for the Prince George's Police Department demonstrating how both officers in uniform and officers undercover in biker attire should properly deal with outlaw motorcycle clubs.

13.     From the beginning, USCP management knew about and authorized Plaintiff's TMC membership. Indeed, Plaintiff first made the acquaintance of TMC members through the nephew of his former supervisor, USCP Inspector Michael Jarboe. At all relevant times, Inspector Jarboe and Plaintiff's subsequent supervisors knew about and approved of Plaintiff's membership in TMC.

14.     In September 2003, USCP's Internal Affairs Division completed an investigation into whether Plaintiff's TMC activities constituted "conduct unbecoming" or an "improper association" under the Agency's Operational Directive PRF 1.3, "Rules of Conduct." The events under investigation included Plaintiff's 1999 encounter with Sonny Barger, an alleged founding member of the Hell's Angels – which happened by chance, in a public setting, and lasted perhaps a minute; Plaintiff's brief and unplanned presence in 2001 outside a Hell's Angel's clubhouse in Connecticut; and the decision by several members of TMC, but not Plaintiff, to quit TMC and join the Hell's Angels in late 2001. After interviewing Plaintiff and considering his explanation for these incidents, the Internal Affairs Division found the allegation of "improper association" to be unfounded and the allegation of "conduct unbecoming" unsupported by sufficient evidence.

15.     As a result of the Internal Affairs Division investigation, then USCP Chief Terrance Gainer received and approved a recommendation to sustain none of the charges against Plaintiff and to impose no discipline. Neither Chief Gainer nor any other Agency official ever counseled Plaintiff to discontinue his association with TMC. The Agency's failure to counsel Plaintiff, together with Internal Affairs' finding that his contact with outlaw motorcycle clubs did not rise

to the level of actionable misconduct, signaled the Agency's approval of Plaintiff's activities with TMC.

16.     In September 2007, the Federal Bureau of Investigation ("FBI") requested that the Agency's Office of Inspector General ("OIG") release certain documents under USCP control as part of an FBI investigation into alleged criminal activity by three USCP employees and TMC members: Sergeant Charles Brown; Rick Blank, a USCP mechanic; and Plaintiff.  After conducting surveillance operations and interviewing witnesses, the FBI declined to seek criminal prosecution.

17.     Subsequently, OIG initiated its own investigation into whether Sergeant Brown, Mr. Blank, or Plaintiff committed criminal and administrative violations.  In the course of that investigation, OIG subpoenaed all of Plaintiff's personal financial records, but uncovered nothing that could persuade the United States Attorney's Office ("USAO") to file criminal charges.

18.     On January 19, 2009, the Agency placed Plaintiff on administrative leave pending the outcome of the OIG investigation.  The United States Black Capitol Police Association ("BCPA") pressured the Agency to take that step on the eve of President Obama's inauguration. According to the BCPA's publication entitled *Racism Unchecked: The Saga of the U.S. Capitol Police's Discriminatory Employment Practices and its Defense of Those Practices*, Agency officials perceived TMC to be a "domestic group[] with white supremacist views," but only "reluctantly" acquiesced to the BCPA's demand that Plaintiff and Sergeant Brown be suspended.

19.     The OIG investigation concluded that Plaintiff's activity with TMC amounted to "conduct unbecoming," "improper associations," and "outside employment" for which Plaintiff failed to request prior permission.

20.     One of the allegations in the OIG's Report of Investigation ("ROI") was that Sergeant Brown had been observed wearing a patch similar to the Nazi "SS" insignia.  The ROI omitted, however, that as soon as TMC leadership became aware of Sergeant Brown's "SS" patch they ordered him to remove it at once.  Another allegation was that TMC admitted Jason Brunner into full club membership despite knowing that Mr. Brunner belonged to the white supremacist National Alliance.  Contrary to the ROI, however, as soon as TMC leadership became aware of Mr. Brunner's affiliation with the National Alliance, Plaintiff convened a club meeting for the purpose of revoking Mr. Brunner's membership.  At that meeting, TMC members -- including Mr. Brunner's own father -- voted unanimously to expel him from the club.

21.     On May 5, 2010, the Agency issued a "Request for Disciplinary Action" based on three charges: "conduct unbecoming," "improper associations," and "outside employment" for which Plaintiff failed to request prior permission.  The proposed penalty was Plaintiff's removal from the federal service.

22.     Despite Plaintiff's need to defend the charged misconduct, the Agency would not release the ROI to him unless he agreed to enter into a non-disclosure agreement.  Even then, the Agency provided Plaintiff only with a redacted copy of the ROI.  Information that the Agency redacted included the name of a law enforcement agency investigating Plaintiff and the identities of witnesses who provided statements against him.  When Plaintiff requested that the Agency provide him with an unredacted version of the ROI, the Agency declined on the grounds that it did not propose Plaintiff's removal on the basis of any information from an unnamed witness.

23.     Prior to the Agency's Disciplinary Review Board ("DRB") hearing, Plaintiff resigned his membership in TMC.

24.     On August 18, 2010, the Agency selected Inspector Daniel Malloy to serve as the

Presiding Officer for Plaintiff's DRB hearing.  Upon information and belief, Inspector Malloy and/or his wife were associated with the BCPA, which was responsible for publishing *Racism Unchecked*, suggesting that Plaintiff associated with white supremacists and citing the Agency's alleged reluctance to suspend him as evidence of racial bias in favor of white employees.

25.     After Plaintiff's counsel objected that Inspector Malloy could not impartially decide the charges, the Agency replaced him with Inspector Jeffrey Pickett.  Inspector Pickett also had a potential conflict of interest inasmuch as Plaintiff had previously testified for the prosecution against Inspector Pickett's brother, who faced federal criminal charges arising out of the anthrax scare of 2001.

26.     On October 5, 2010, the Agency convened a DRB preliminary meeting, with Inspector Pickett presiding, to select the members of the DRB.  Under the applicable Agency rules, prospective DRB members are selected randomly, at which point either party may propose to eliminate that individual either for cause or by using one of two peremptory challenges.

27.     Prior to the random selection process, Plaintiff, through counsel, requested the disqualification of any BCPA members on the grounds that their organization's publication, *Racism Unchecked*, demonstrated a predetermined conclusion as to Plaintiff's alleged misconduct and an inability to decide the case impartially.  Presiding Officer Pickett denied that request at the preliminary meeting and again after Plaintiff's counsel sent a written request for reconsideration.

28.     One of the USCP officers chosen by random selection to serve on the DRB was Lieutenant (now Captain) Richard McArthur. Plaintiff reasonably expected Captain McArthur to take a favorable view of his case by virtue of his former association with TMC as a probationary member.  At the time of Captain McArthur's selection, the Agency had a peremptory challenge

that could have eliminated him from the DRB, but Agency counsel Scharon Ball declined to use it. Instead, Agency counsel objected to Captain McArthur on the grounds that the Agency interviewed him in connection with its investigation into Plaintiff's alleged misconduct. Presiding Officer Pickett denied that objection, however, and approved Captain McArthur for the DRB.

29.    At that point, Captain Bernie Hawco requested reconsideration of Presiding Officer Pickett's decision to approve Captain McArthur as a DRB member. Captain Hawco claimed that Captain McArthur was ineligible to serve on the DRB after having been interviewed during the investigation. Captain Hawco's request was procedurally improper because he participated in the DRB preliminary meeting not in the role of an advocate but in an allegedly neutral capacity as a representative of the Office of Professional Responsibility. Captain Hawco could not represent the Agency during the DRB preliminary meeting because the Agency intended to (and did) call him as a fact witness in its case against Plaintiff. In any event, Presiding Officer Pickett denied Captain Hawco's request for reconsideration, stating that the mere fact that the Agency interviewed Captain McArthur does not establish that he has prior knowledge of the specific allegations against Plaintiff. Instead, Presiding Officer Pickett invited Agency counsel to eliminate Captain McArthur by peremptory challenge, which Agency counsel again declined to do.

30.    Rather than permit the parties to proceed with selecting the DRB members, however, Captain Hawco repeated his request that Captain McArthur be excluded from the DRB for cause. This time, Captain Hawco alleged that Captain McArthur was currently under investigation by the Office of Professional Responsibility. Rather than explaining his basis for that allegation, however, Captain Hawco asked to confer with Presiding Officer Pickett about the matter off the

record and in the absence of Plaintiff's counsel.  When Plaintiff's counsel objected to that ex parte communication, Presiding Officer Pickett reversed his prior decision and struck Captain McArthur from the DRB for reasons that he did not specify.

31.     Upon information and belief, it was not true that Captain McArthur was under investigation at the time of the DRB preliminary meeting.  Indeed, the Agency had chosen Captain McArthur to assume Plaintiff's job duties after placing Plaintiff on administrative leave.

32.     Plaintiff's counsel requested in writing that Presiding Officer Pickett restore his original decision to permit Captain McArthur to serve on the DRB, but Presiding Officer Pickett declined.

33.     On November 9 and 10, 2010, the Agency held a DRB hearing to determine whether the Agency could carry its burden of proof on the three charges and the proposed penalty.

34.     During the course of the DRB, the Agency presented Captain Hawco to testify as a fact witness, despite his participation on the Agency's behalf in selecting the DRB members. Captain Hawco's testimony prejudiced Plaintiff by raising numerous allegations not contained in the ROI.  When counsel objected to Captain Hawco's testimony on the grounds that it introduced new and material evidence of which the Agency gave Plaintiff no prior notice, Presiding Officer Pickett took the proceedings off the record and held an impromptu meeting with the parties in his office.  During the course of that meeting, Agency counsel explained that Captain Hawco's source of information for these previously undisclosed allegations was a sworn statement from Sergeant Brown.

35.     Sergeant Brown's name was one of those redacted from the ROI, demonstrating the falsity of the Agency's assertion that it did not remove Plaintiff in reliance on statements from undisclosed witnesses.

36.     In an attempt to remedy the Agency's failure to share relied-upon evidence with Plaintiff, Presiding Officer Pickett ordered Captain Hawco to produce a copy of the statement at once to Plaintiff's counsel, whom he permitted to review it for a few minutes before Captain Hawco resumed his testimony. Plaintiff's counsel requested permission to call Sergeant Brown to testify, but Presiding Officer Pickett denied that request.

37.     When Captain Hawco resumed his testimony, however, he once again prejudiced Plaintiff by raising allegations contained neither in the ROI nor in the newly-produced statement from Sergeant Brown. Plaintiff's counsel objected and Presiding Officer Pickett convened another off-the-record meeting in his office. During that second meeting, the Agency admitted that, even after the first meeting, it had not turned over all of Sergeant Brown's sworn statements. When ordered to do so, the Agency belatedly produced a sworn statement that Sergeant Brown gave to the FBI. Unlike the first statement from Sergeant Brown, this one indicated that the FBI had made him a "proffer" in exchange for his testimony against Plaintiff.

38.     At the close of evidence, the five-officer DRB panel found that the Agency had not proven the charges of "improper associations" and failure to request permission for outside employment. The DRB sustained only the charge of "conduct unbecoming." On the basis of that finding, the DRB sent a recommendation to Chief Phillip Morse that the penalty of removal be mitigated to a 14-day suspension.

39.     Contrary to that recommendation from the DRB, however, Chief Morse sustained Plaintiff's removal. Chief Morse claimed, in his notice of recommendation, to base his decision only on the charge of "conduct unbecoming."

40.     In removing Plaintiff, Chief Morse explicitly relied upon each of the allegations that

the 2003 Internal Affairs Division investigation found not to support any misconduct: Plaintiff's accidental encounter with Sonny Barger; Plaintiff's visit to the clubhouse of a Connecticut chapter of the Hell's Angels, which Plaintiff did not enter; and the fact that some members of TMC, but not Plaintiff, eventually joined the Hell's Angels.

41.     In addition, Chief Morse also cited several instances in which Plaintiff attended events open to the public at which a few members of outlaw motorcycle clubs were allegedly also present, such as a motorcycle event hosted by a local restaurant; a funeral for a young father; and charity events including a "Toys for Tots" fundraiser organized by the United States Marine Corps and a benefit for military families co-sponsored by the United Services Organization and Operation Homefront.

42.     Chief Morse did not base his removal decision solely on the evidence of record, however, but rather speculated – without providing Plaintiff any prior notice – that the evidence in the ROI "represent[s] only a small sample of what was a far greater number of contacts with 1% members and clubs."

43.     Where Chief Morse's assertions did not go beyond the evidence of record, they were frequently contrary to it, such as his assertion that Plaintiff voted to include Jason Brunner as a member of TMC despite knowing that he was also a member of the white supremacist National Alliance.  Similarly, Chief Morse alleged that Plaintiff had "repeated contacts with known felons," exactly the elements of the "improper associations" charge that the DRB did not sustain and upon which Chief Morse claimed not to rely.

44.     Chief Morse did not address the question of whether the Agency provided Plaintiff

with due process or the question of whether Plaintiff's alleged attendance at public events and charitable fundraisers enjoys First Amendment protection.  Although Chief Morse claimed to have considered mitigating factors, he identified none of them.

45.    Chief Morse submitted his recommendation of termination to the USCPB, which sustained the recommendation without comment.  Upon information and belief, the vote was 2-to-1, with Defendants Livingood and Ayers voting in favor of removal and Defendant Gainer voting against.

46.    The Agency did not provide Plaintiff any opportunity to provide either Chief Morse or the United States Capitol Police Board with a response to the charged misconduct.

47.    On June 3, 2011, Plaintiff initiated counseling with the Office of Compliance, asserting claims of race- and age-based discrimination; slander and libel; denial of due process; and unlawful interference with his Constitutional freedom of speech and freedom of association. The counseling period ended on July 5, 2011 without a resolution to Plaintiff's claims.

48.    On July 15, 2011, Plaintiff's case with the Office of Compliance entered the mediation period.  Although the parties conducted a face-to-face mediation session and numerous settlement discussions by telephone, the mediation period ended on January 16, 2012 without a resolution to Plaintiff's claims.

49.    Plaintiff received the Office of Compliance's notice of the end of mediation on or about January 23, 2012, indicating that he has exhausted his administrative remedies and may file suit in this Court.

<u>COUNT ONE: AGE DISCRIMINATION</u>

50.    Plaintiff repeats and incorporates by reference the assertions in paragraphs 1 – 49.

51.    The Congressional Accountability Act ("CAA"), 2 U.S.C. § 1302(a)(4), applies the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., to the legislative branch of the federal government.

52.     The ADEA prohibits employers from terminating an employee, or taking other discriminatory employment action, because of the employee's age.  29 U.S.C. § 623(a)(1).  The ADEA prohibitions apply to individuals who are at least 40 years of age.  Id. at 631(a).

53.     Plaintiff is over 40 years of age.

54.     Plaintiff's age was a motivating factor in the Agency's decision to terminate him, as evidenced by the Agency's preferential treatment of similarly-situated, younger employees.

55.     By way of comparison, the Agency did not terminate younger Dignitary Protection Officer Victor Bryant for conduct unbecoming, despite committing acts far more egregious than anything Plaintiff was alleged to have done.  In approximately 2010, Officer Bryant went to a music concert, leaving his Agency-issued firearm unsecured in a hotel room, contrary to Agency policy.  When he returned to the hotel, intoxicated, Officer Bryant discovered that his room had been rented to a black family, at which point he forced his way into the room, seized his gun, and aimed it at them while calling them "fucking niggers" and issuing verbal threats.  The commotion caused the hotel manager to call local police, who arrested Officer Bryant and charged him with felony reckless endangerment and assault.  Upon information and belief, the Agency's only disciplinary response to this incident was to suspend Officer Bryant for 40 hours.

56.     In another illustration of the Agency's preferential treatment for younger employees, the Agency did not terminate Officer McMann, whose conduct was reported extensively in local newspapers after he discharged a firearm in his house, accidentally shooting a taxi-driver, and then, one year later, broke into a woman's home while intoxicated.  Upon information and belief, the Agency returned Officer McMann to duty after he served a 30-day suspension.

57.     Plaintiff's fellow TMC member Rick Blank is younger than Plaintiff.  Mr. Blank is not a law enforcement officer, but rather a mechanic in the Agency's s vehicle maintenance department.  Nevertheless, the Agency's rules against conduct unbecoming apply to all employees, both sworn and civilian, equally.  Although Mr. Blank participated in most or all of the alleged misconduct for which the Agency terminated Plaintiff, Mr. Blank remains employed with the Agency and in good standing.

COUNT TWO: RACE DISCRIMINATION

58.     Plaintiff repeats and incorporates by reference the assertions in paragraphs 1-57. The CAA applies Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) to the legislative branch of the federal government.

59.     Title VII prohibits employers from terminating an employee because of the employee's race.  42 U.S.C. § 2000e-2(a)(1).

60.     The Plaintiff's race is Caucasian.

61.     Plaintiff's race was a motivating factor in the Agency's decision to terminate him, as evidenced by the fact that the BCPA successfully pressured the Agency to take disciplinary action against Plaintiff on the false and disproven pretense that he associates with white supremacists.  At the time, BCPA members had filed class action lawsuits against the Agency alleging that the Agency gave preferential treatment to white employees, so Plaintiff's case gave the Agency an opportunity to show "equal treatment" by meting out unreasonably harsh discipline to one of those white comparison employees.  As further evidence of the Agency's capitulation to BCPA pressure, the Agency originally assigned a BCPA member to serve as the Presiding Officer of Plaintiff's DRB and then refused to disqualify BCPA members from serving

on the DRB, while eliminating Captain McArthur, a duly-selected white DRB member, for unstated reasons.

62.    In addition, the Agency has given preferential treatment to similarly-situated black employees.  For example, even after Captain Eric Graves committed his second offense of looking at pornography while on duty, the Agency merely suspended him and reduced him from Captain to Lieutenant in rank, while still paying him a Captain's salary.  Neither did the Agency terminate Officer Westbrooks after he was caught during duty hours in the company of a transvestite prostitute, who managed to relieve him of his Agency-issued firearm.  Officer Carney wrecked her personal vehicle and had her driver's license suspended, while Officer Graham caused a traffic accident in his official duty vehicle while driving with a suspended license, but the Agency did not terminate either of them.  Likewise, Officer Vernon Alston had approximately six AWOL charges, but the Agency never terminated him or even initiated a request for disciplinary action, despite Agency rules mandating it.

<u>COUNT THREE: DENIAL OF DUE PROCESS</u>

63.    Plaintiff repeats and incorporates by reference the assertions in paragraphs 1 – 62.

64.    Defendants deprived Plaintiff of a protected property interest in his continued federal employment without due process of law, contrary to the Fifth Amendment of the United States Constitution.

65.    Under the United States Capitol Police Administrative Technical Corrections Act of 2009, the Chief of the USCP may terminate an officer only after providing notice of the termination to the USCPB and receiving USCPB approval.  Pub. L. no. 111-145, 124 Stat 50 (2010).  The Chief's authority to terminate is further limited by "applicable laws and regulations." <u>Id.</u>

66.    By law and regulation, the Chief may not terminate an officer except in a manner that is consistent with, and fulfills, the conditions set forth in General Order 2221, "CP-535 Request for Disciplinary Action," General Order 2222, "Disciplinary Review Board," and any supplemental General Orders in that series.  Those General Orders require, among other procedural protections, that the Agency provide the employee notice of the charge, an opportunity to review the supporting documentation, and an opportunity to respond.  The General Orders do not permit the imposition of discipline for alleged misconduct that is not supported by at least substantial evidence.

67.    The Agency did not provide Plaintiff with Constitutionally-proper notice of the charged misconduct, but instead withheld material information by redacting the names of relied-upon witnesses from the ROI; failing to timely provide Plaintiff's counsel with copies of relied-upon witness statements; and imposing the penalty of removal on the basis of allegations not contained in the ROI and not presented to the DRB.

68.    The Agency did not provide Plaintiff with a Constitutionally-proper opportunity to respond to the charged misconduct.  Instead, the Agency disqualified a duly-selected DRB member without good cause shown; repeatedly produced relied-upon witness statements to Plaintiff's counsel for the first time after the DRB was already underway; refused to allow Plaintiff to call his chief accuser, Sergeant Brown, as a witness at the hearing; and never allowed Plaintiff an opportunity to respond directly to the ultimate decision-makers, Chief Morse and the USCPB.

69.    The Agency did not honor its obligation to refrain from discipline on the basis of charges unsupported by substantial evidence.  Instead, Chief Morse's notice of termination contained numerous allegations that are false and contrary to all the evidence of record,

including suggestions that Plaintiff knowingly associated with a white supremacist; that Plaintiff, acting as TMC President, approved a cash donation to an outlaw motorcycle club; that Plaintiff was sponsored for TMC membership by a convicted felon; that a TMC member was arrested for illegal possession of a firearm that Plaintiff gave him; that the evidence contained in the ROI "represent[s] only a small sample of what was a far greater number of contacts with 1% members and clubs"; that Plaintiff's alleged misconduct impaired Agency operations; and that the 2003 Internal Affairs investigation gave Plaintiff notice that he should discontinue his membership in TMC.

## COUNT FOUR: VIOLATION OF FREEDOM OF SPEECH

70.    Plaintiff repeats and incorporates by reference the assertions in paragraphs 1 – 69.

71.    The First Amendment to the United States Constitution protects freedom of speech.

72.    Defendants violated Plaintiff's freedom of speech by terminating him on the basis of numerous acts of protected speech regarding matters of public concern, including attending the funeral of a young local father and donating money to his widow and orphaned children; attending a motorcycle event hosted at a public restaurant; and participating in charitable events including a "Toys for Tots" fundraiser organized by the United States Marine Corps and a benefit for military families co-sponsored by the United Services Organization and Operation Homefront.

## COUNT FIVE: VIOLATION OF FREEDOM OF ASSOCIATION

73.    Plaintiff repeats and incorporates by reference the assertions in paragraphs 1 – 72.

74.    The First Amendment to the United States Constitution protects freedom of association.

75.    The Defendants violated Plaintiff's freedom of association by terminating him on the

basis of numerous protected associations, principal among them his association with TMC, an organization whose mission involves, and that advocates for, matters of public concern.

76.    The Defendants further violated Plaintiff's freedom of association by terminating him on the basis of other protected associations, such as Plaintiff's attendance at the funeral of a young local father and his donation of money to the man's widow and orphaned children and Plaintiff's attendance at charitable events organized by the United States Marine Corps, the United Services Organization, and Operation Homefront.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a) reverse the Agency's termination action and restore Plaintiff to his former position;

(b) award all back pay, benefits, costs, interest, retroactive raises and overtime pay and other monetary relief to which Plaintiff is entitled;

(c) issue a declaratory judgment finding that Plaintiff's termination, under the facts of this case, violated the CAA and the First and Fifth Amendments to the United States Constitution;

(d) grant all other equitable, injuctive, and declaratory relief available under the ACA and the First and Fifth Amendments to the United States Constitution;

(e) award the Plaintiff compensatory damages in a proven amount not to exceed $300,000;

(f) award Plaintiff his costs and reasonable attorney fees;

(g) grant such other and further relief as this Court may deem just and proper.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all matters so triable.

Dated: April 19, 2012

Respectfully submitted:

Peter H. Noone
MA Bar No. 631341
AVERY DOOLEY POST & AVERY, LLP
90 Concord Avenue
Belmont, MA 02478
Tel: (617) 489-5300
Fax: (617) 4898-0085
pnoone@averydooley.com

Patrick C. Tinsley
MA Bar No. 663648
AVERY DOOLEY POST & AVERY, LLP
90 Concord Avenue
Belmont, MA 02478
Tel: (617) 489-5300
Fax: (617) 4898-0085
ptinsley@averydooley.com

Attorneys for the Plaintiff

John P. Mahoney, Esq.
D.C. Bar No. 442839
Partner & Chair
Labor & Employment Law Practice Group
TULLY RINCKEY PLLC
Attorneys & Counselors at Law
1800 K Street N.W. Ste. 1030
Washington, D.C. 20006
Tel: (202) 787-1900
Fax: (202) 640-2059
jmahoney@fedattorney.com
www.fedattorney.com

Local Counsel for the Plaintiff